# AMERICAN BIOPHYSICS CORP.

## NON-EXCLUSIVE DISTRIBUTORSHIP AGREEMENT

This Non-Exclusive Distributorship Agreement ("Agreement") is made as of February 19, 2002 (the "Effective Date"), by and between American Biophysics Corp., with its principal place of business located at 2240 South County Trail, East Greenwich, Rhode Island 02818, ("Manufacturer") and Dubois Marine Specialties with its principal place of business located at 8184 Henderson Highway, Selkirk, Manitoba, Canada R1A 2A8 ("Distributor").

Manufacturer desires to appoint Distributor, and Distributor desires to accept appointment, as a distributor of Manufacturer's products as set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements promises set forth herein, the parties agree as follows:

1) **Rights Granted**.
Manufacturer hereby grants to Distributor a non-exclusive right, on the terms and conditions contained below, to purchase, inventory, promote and resell Manufacturer's Products (which do not include installation, service or maintenance) as defined herein, solely within the Marketing Area (Exhibit A). As used in this Agreement, the term Manufacturer's Products or Products (Exhibit B) shall mean the products, related service parts and accessories manufactured and/or sold by Manufacturer. Nothing herein shall prevent or prohibit Manufacturer from selling any of Manufacturer's Products within the Marketing Area directly to the customers listed in Exhibit A or entering into agreements with other distributors in the Marketing Area. However manufacturer agrees to keep the Distributor aware of such changes.

2. **Terms of Sale; Payment**.

a) All sales of Manufacturer's Products to Distributor shall be made pursuant to this Agreement at such prices and on such terms as Manufacturer shall establish from time to time. The initial prices for the Manufacturer's Products are set forth in Exhibit B. Manufacturer may change any price or any other term of sale upon thirty (30) days notice to Distributor. All prices and shipments are FOB Manufacturer, and do not include costs for transportation, insurance, taxes, customs duties, fees or other similar charges paid by Distributor. All orders are subject to acceptance by Manufacturer. This Agreement shall control all aspects of the dealings between Manufacturer and Distributor with respect to the Manufacturer's Products and any additional or different terms in any Distributor order or other communication are hereby rejected.

b) Distributor shall pay all charges due hereunder within thirty (30) days of the date of Manufacturer's invoice. Overdue amounts shall bear interest at the greater of (a) eighteen percent (18%) per annum or (ii) the highest rate of interest allowed by the laws of the State of Rhode Island.

3. **Marketing Obligations; Forecasts and Orders**.

a) Distributor will at all times maintain adequate inventories of Manufacturer's Products and will promote vigorously and effectively the sale of Manufacturer's Products through all channels of distribution prevailing in Distributor's Marketing Area, in conformity with Manufacturer's marketing policies and programs, as they may be in effect be from time to time. Distributor will use its best efforts to sell Manufacturer's Products to aggressive, reputable, and financially responsible dealers providing satisfactory consumer service throughout Distributor's Marketing Area.

b) Such promotion, sales and maintenance activities will include, without limitation:

1) Maintaining a fully trained sales organization capable of active solicitation of such sale of Products;
2) Handling of all inquiries, quotations and orders for the Products promptly and efficiently;

c) Distributor will be responsible for providing Distributor's sales force with "pre-sales" technical support. Distributor will appoint a specific individual who will serve as Distributor's contact to Manufacturer. This person will act as the primary point of contact between Distributor and Manufacturer for sales and support issues that cannot be handled by Distributor.

d) Distributor will provide Manufacturer with a rolling 12-month sales forecast (Exhibit C) each quarter by month for the first six (6) months and by quarter for the last six (6) months. The first three months of each new rolling forecast will be firm and not subject to change. Forecasts will be updated each such three-month period, no later than the last day of the prior quarter.

e) Upon execution of the Agreement, Distributor shall issue a firm purchase order for the first three month period (including demonstration and inventory requirements) and a rolling forecast for the balance of the year, with specified delivery dates for the Products presented by Distributor and subject to Manufacturer's acceptance. Prior to the end of the initial three-month period, and prior to each three-month period thereafter, Distributor shall issue a firm purchase order for the succeeding three-month period. Deliveries are to be in accordance with the terms therein. Distributor shall maintain a stock of the Products during the term of this Agreement as agreed to with Manufacturer. In the event that Distributor fails to order and take delivery of Products to maintain stocking requirements, Manufacturer shall have the option of terminating the Agreement forthwith without any liability to Manufacturer.

f) During the term of this Agreement Distributor will not market or sell products deemed as competitive to Manufacturer.

g) Distributor agrees to supply timely and accurate sell through data on a weekly basis.

4. **Advertising Policies**.

a) Manufacturer will cooperate with Distributor and its dealers in providing for continuous and effective advertising and promotion of Manufacturer's Products throughout Distributor's principal marketing area, and Distributor agrees at Distributor's expense to participate in, actively promote and faithfully comply with the terms and conditions of such cooperative advertising and merchandising programs as Manufacturer has establish in conjunction with the Distributor (Exhibit D). Nothing herein shall prevent Distributor from independently advertising and marketing the Manufacturer's Products, provided the form and intent of the advertising or marketing materials are in accordance with Manufacturer's published specifications and installation materials and approved by Manufacturer in advance.

b) Distributor will make no representations, guarantees or warranties regarding the performance or functional characteristics of the Products beyond those stated in Manufacturer's printed literature and brochures, nor make any delivery promises inconsistent with the delivery schedules of Manufacturer.

5. **Product Warranty Policies; Order Processing and Returns**.

a) Manufacturer shall provide to Distributor information with respect to Manufacturer's limited warranty extended to the original consumer of Manufacturer's Products. Distributor shall direct any original consumer with a warranty claim to follow Manufacturer's warranty procedures. Notwithstanding the foregoing, Distributor may, with Manufacturer's prior written permission, accept the return of an allegedly defective Manufacturer's Product, in which case Distributor shall have the same rights and obligations as the original consumer and Manufacturer shall have no obligations to such consumer.

b) Manufacturer will employ its best efforts to fill Distributor's orders promptly on acceptance, but reserves the right to allot available inventories among distributors at its discretion.

c) All purchase orders issued by Distributor are non-cancelable. Distributor agrees to provide Manufacturer a minimum 90 day notification in writing, should the future 90 day production requirements be modified, otherwise, Distributor is obligated to purchase as originally forecasted in (Exhibit C) for that period.

6. **Indemnification.**

Distributor agrees to indemnify and hold Manufacturer harmless from any loss or claim arising out of (a) the negligence of Distributor, Distributor's agents, employees or representatives in the marketing, advertising or sale of Manufacturer's Products, (b) any representation or warranty made by Distributor, its agents, employees or representatives with respect to Manufacturer's Products that exceeds Manufacturer's limited warranty or (c) any failure to perform Distributor's obligations under this Agreement.

**7) Modification of Discontinuance of Product by Manufacturer.**

a) Manufacturer reserves the right to modify or delete the Products upon sixty (60) days notice to Distributor.

b) It is understood that new and additional products may be introduced by Manufacturer from time to time. Distributor shall be authorized to solicit orders for sales of such new or additional products only if and when Manufacturer authorizes Distributor, in writing, to represent Manufacturer in connection with each such product.

**8) Financial Policies.**
Distributor acknowledges the importance to Manufacturer of Distributor's sound financial operation and Distributor expressly agrees that it will:

a) Maintain and employ in connection with Distributor's business and operations under this Agreement such working capital and net worth as may be required to enable Distributor properly and fully to carry out and perform all of Distributor's duties, obligations and responsibilities under this Agreement;

b) Pay promptly all amounts due Manufacturer in accordance with terms of sale extended by Manufacturer from time to time;

c) Furnish Manufacturer with financial statements in such form as Manufacturer may reasonably require from time to time for credit purposes; and

d) Furnish, at Manufacturer's request, a detailed reconciliation of Manufacturer's statements of account with Distributor's records, listing all differences, and showing net amount Distributor acknowledges to be due Manufacturer. Manufacturer reserves the right to audit Distributor's books and records relating to the marketing, advertising and sale of Manufacturer's Products.

In addition to any other right or remedy to which Manufacturer may be entitled, shipments may be suspended at Manufacturer's discretion in the event that Distributor fails to promptly and faithfully discharge each and every obligation in this Section.

**9) Use of Manufacturer's Name and Information.**

a) Distributor will not use, authorize or permit the use of, the name "Mosquito Magnet™ Pro, Mosquito Magnet™, BioTrap" or any other trademark or trade name owned by Manufacturer as part of its firm, corporate or business name in any way. Distributor shall not contest the right of Manufacturer to exclusive use of any trademark or trade name used or claimed by Manufacturer. Distributor may, subject to Manufacturer's policies regarding reproduction of same, utilize Manufacturer's name, trademarks or logos in advertising on stationery and business cards.

b) On termination of this Agreement, Distributor will remove and not thereafter use any sign containing any trade name, logo or trademark of Manufacturer including, but not limited to, "Mosquito Magnet™Pro, Mosquito Magnet™, BioTrap", and will immediately destroy all stationery, advertising matter and other printed matter in its possession or under its control containing such name, or any of Manufacturer's trademarks, trade names or logos. Distributor will not at any time after such termination use or permit any such trademark or logo to be used in any manner in connection with any business conducted by it or in which it may have an interest, or otherwise whatsoever as descriptive of or referring to anything other than merchandise or products of Manufacturer. Regardless of the cause of termination, Distributor will immediately take all appropriate steps to remove and cancel its listings in telephone books, and other directories, and public records, or elsewhere that contain the Manufacturer's name, logo or trademark. If Distributor fails to obtain such removals or cancellations promptly, Manufacturer may make application for such removals or cancellations on behalf of Distributor and in Distributor's name and in such event Distributor will render every assistance.

c) Distributor acknowledges and agrees that all documents, data, software or information in any form which are provided by Manufacturer (hereinafter "Confidential Information") is the property of Manufacturer. Distributor will receive and maintain all Confidential Information in the strictest confidence and, except as provided herein, shall not use Confidential Information for its own benefit or disclose it or otherwise make it available to third parties without the prior written consent of Manufacturer. Nothing in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information, trademarks, patents or copyrights of Manufacturer, except for the limited purposes of Distributor's performance hereunder. At the request of Manufacturer, and in any event upon the expiration or other termination of this Agreement, Distributor shall promptly deliver to Manufacturer all records or other things in any media containing or

embodying Confidential Information, including any copies thereof. The terms of this Section 9(c) shall survive the termination or expiration of this Agreement.

**10) Term and Termination**.
The term of this Agreement shall commence on the "Effective Date" as set forth herein and shall continue for a period of one (1) year from this date, and thereafter shall automatically renew from year to year, unless terminated in accordance with the terms of this Agreement.

a) Either party may terminate at any time by written notice given to the other not less than thirty (30) days prior to the effective date of such notice.

b) Manufacturer may terminate this Agreement upon notice to Distributor, upon any of the following events: (1) failure of Distributor to fulfill or perform any one of the duties, obligations or responsibilities of Distributor in this Agreement, which failure is not cured with 30 days notice from Manufacturer; (2) any failure to pay any amount due hereunder; (3) any assignment or attempted assignment by Distributor of any interest in this agreement or delegation of Distributor's obligations without Manufacturer's written consent; (4) any sale, transfer or relinquishment, voluntary or involuntary, by operation of law or otherwise, of any material interest in the direct or indirect ownership or any change in the management of Distributor; (5) failure of Distributor for any reason to function in the ordinary course of business; or (6) submission by Distributor to Manufacturer of false or fraudulent reports or statements, including, without limitation, claims for any refund, credit, rebate, incentive, allowance, discount, reimbursement or other payment by Manufacturer.

c) On termination of this Agreement, Distributor shall cease to be an authorized distributor of Manufacturer and:

1. All amounts owing by Distributor to Manufacturer shall, notwithstanding prior terms of sale, become immediately due and payable;

2. All unshipped orders shall be canceled without liability of either party to the other;

3. Manufacturer on demand, free and clear of liens and encumbrances, such of Manufacturer's Products and materials bearing Manufacturer's name as Manufacturer shall elect to repurchase, at a mutually agreed price, but not in excess of Manufacturer's current price to distributors for such products and materials, provided that Manufacturer shall not be obligated to pay Distributor for any item originally provided free of charge;

4. Manufacturer shall have all other remedies available to it at law and/or equity.

**11) Miscellaneous**.

a) The relationship between Manufacturer and Distributor is that of vendor and vendee. Distributor, its agents and employees shall, under no circumstances, be deemed employees, agents or representative of Manufacturer. Distributor will not modify any of Manufacturer's Products without written permission from Manufacturer. Neither Distributor nor Manufacturer shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect whatsoever.

b) Each party acknowledges that no representation or statement, and no understanding or agreement, has been made, or exists, and that in entering into this Agreement each party has not relied on anything done or said or on any presumption in fact or in law, (1) with respect to this Agreement, or to the duration, termination or renewal of this Agreement, or with respect to the relationship between the parties, other than as expressly set forth in this Agreement; or (2) that in any way tends to change or modify the terms, or any of them, of this Agreement or to prevent this Agreement becoming effective; or (3) that in any way affects or relates to the subject matter hereof. Distributor also acknowledges that the terms and conditions of this Agreement, and each of them, are reasonable and fair and equitable.

c) Distributor agrees, and shall cause each of its intermediaries, distributors and customers to agree, not to export or re-export, directly or indirectly, any Products, any parts thereof, any direct products thereof or any technical data without prior approval from the Manufacturer.

d) This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

e) Neither this Agreement nor any interest in this Agreement may be assigned by Distributor without the prior express written approval of Manufacturer, which may be withheld by Manufacturer at Manufacturer's absolute discretion.

f) Except as expressly provided in this Agreement, waiver by either party, or failure by either party to claim a default, of any provision of this Agreement shall not be a waiver of any default or subsequent default.

g) Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services;

If to Manufacturer:
American Biophysics Corp.
2240 South County Trail
East Greenwich, Rhode Island 02818

If to Distributor:
Dubois Marine Specialties
8184 Henderson Highway

Selkirk, Manitoba, Canada R1A 2A8 Canada

h) This Agreement shall be construed and enforced in accordance with the laws of the state of Rhode Island. The parties agree that the courts of the State of Rhode Island, and the Federal Courts located therein, shall have exclusive jurisdiction over all matters arising from this Agreement.

i) If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

j) Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

AMERICAN BIOPHYSICS CORP.

By________________________
Richard Dunne
Vice President, Sales & Marketing

DISTRIBUTOR

By________________________
John Dubois

# Exhibit A

Primary Market: Commercial accounts in the following states

| | |
|---|---|
| TERRITORY: | All of Canada |
| | |
| MARKET: | All accounts except: Propane Dealers, Big Box Stores |

# Exhibit B

| Manufacturers products | | Dist Cost US Dollars | MSRP US Dollars |
|---|---|---|---|
| 1000MM-P.Pack | Pro Power Pack & Top Housing | $795.00 | $1,295.00 |
| MM-Base | Mosquito Magnet Base | | |

*(The product is MAP at $1295.00 unless otherwise agreed to in writing my manufacturer)*

| | | | |
|---|---|---|---|
| 2000MM-P.Pack | Freedom Power Pack | $485.00 | $795.00 |
| 2000MM-Top | Freedom Top Housing | | |
| MM-Base | Mosquito Magnet Base | | |

*(The product is MAP at $795.00 unless otherwise agreed to in writing my manufacturer)*

| | | | |
|---|---|---|---|
| 3000MM-P.Pack | Liberty Power Pack | $297.00 | $495.00 |

*(The product is MAP at $495.00 unless otherwise agreed to in writing my manufacturer)*

Accessories:

| | | | |
|---|---|---|---|
| MMNET-6 | MMPro replacement nets 6 pk | $18.00 | $35.00 |
| MM2000NET-6 | MM Freedom Replacement Net 6 pack | $24.00 | $45.00 |
| MM3000NET-3 | MM Liberty Replacement Net 3 pack | $13.00 | $24.90 |
| MA-3-1000AP | Octenol Cartridge/Packaged 3 pk | $10.25 | $19.90 |
| MA-6-1000AP | Octenol Cartridge/Packaged 6 pk | $18.00 | $35.00 |
| 549-001 | Original Tank Teddie | $8.00 | $14.95 |

# Exhibit C

| | |
|---|---|
| Annual forecasted sales amount: | 1000 units |
| Percentage for three months from effective date | 25% |
| Percentage for six months from effective date | 25% |
| Percentage for nine months from effective date | 25% |
| Percentage for twelve months from effective date | 25% |

Monthly forecast for first three months from February 19, 2002:

| | | | | |
|---|---|---|---|---|
| First month: | Pro's | TBD | MM's | TBD |
| Second month: | Pro's | TBD | MM's | TBD |
| Third month: | Pro's | TBD | MM's | TBD |
| Fourth month: | Pro's | TBD | MM's | TBD |
| Fifth month | Pro's | TBD | MM's | TBD |
| Sixth month | Pro's | TBD | MM's | TBD |

**Forecast not required for 2002 and 2003 to be discussed in late 2002.**